**TRAILWAYS, INC., et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Greyhound Lines, Inc., National Trailways Bus System, Intervenors.**

**No. 80–1713.**

United States Court of Appeals, District of Columbia Circuit.

Argued 16 Oct. 1981.

Decided 16 March 1982.

Opinion on Denial of Rehearing May 14, 1982.

---

Robert Lewis Thompson, Washington, D. C., with whom Robert J. Corber, Washington, D. C., was on brief for petitioners.

Cecilia E. Higgins, Atty., I. C. C., Washington, D. C., with whom Richard A. Allen, Gen. Counsel, and Henri F. Rush, Associate Gen. Counsel, I. C. C., Washington, D. C., were on brief for respondents. Barry Grossman and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent, U. S.

Edward G. Villalon and Lawrence E. Lindeman, Washington, D. C., entered appearances for intervenor, Nat. Trailways Bus System.

Before ROBINSON, Chief Judge, and WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

By this appeal petitioners seek to set aside an order of the Interstate Commerce Commission (ICC or Commission) granting authority to Greyhound Lines, Inc. (Greyhound) to serve the intermediate point of Little Rock, Arkansas, on an already authorized direct route between Texarkana, Texas, and Memphis, Tennessee. Because the authorization in question was granted without sufficient consideration of important relevant issues, we deem the Commission's action arbitrary and capricious. We vacate the Commission's order and remand for further proceedings as appropriate.

## I. FACTS

On 16 October 1978 Greyhound applied to the ICC for approval of direct service to Little Rock, Arkansas, between Memphis, Tennessee, to the east and Texarkana, Texas, to the southwest. Prior to applying for this additional authority, Greyhound was serving passengers traveling from Little Rock to Memphis and beyond and from Little Rock to Texarkana and beyond, but could do so only by circuitous routes, off the interstate highway.[1] Greyhound also had authority to provide direct service from Memphis to Texarkana on the interstate highway system, but could not pick up or discharge passengers or packages at Little Rock when it used this route.

Greyhound's application met opposition from Trailways, Inc. (Trailways), whose wholly-owned bus subsidiary, Arkansas Motor Coaches, Ltd., operates over the subject route. Following the submission of written

---

1. Greyhound's passengers could board at Little Rock, travel to Pine Bluff or Stuttgart, Arkansas, and transfer at one of those points to other Greyhound buses destined for Texarkana or Memphis. Brief for the Interstate Commerce Commission at 5.

evidence under the ICC's modified procedure,[2] a three-member staff review board (one member not participating) issued an interim decision granting Greyhound authority for the proposed Little Rock service.[3] The review board noted Trailways' argument that a grant of the authority to Greyhound would divert traffic and revenue from Arkansas/Trailways,[4] and it found that the traffic involved in the subject application "constitutes a considerable part of Arkansas' operations."[5] It also found, however, that the "likelihood of substantial diversion of protestant's [Trailways'] traffic is remote,"[6] and that it was "unable to conclude that the potential diversion of this traffic which a grant might precipitate would materially affect either Arkansas or its parent, Trailways."[7]

Trailways promptly petitioned for administrative review of the board's decision.[8] In its exception to the ruling, Trailways argued extensively the issues of systemwide harm and long-term anticompetitive impact that would result from Greyhound's authority to provide the more direct service, and claimed that the review board failed to consider this aspect of public interest. It also requested that the Commission take official notice of certain comments which Trailways had filed in another Commission proceeding (then pending) on issues of the competitive structure of the bus industry,

and urged the Commission to consider the Little Rock application along with five other applications which had been filed by Greyhound at about the same time. Trailways' contention was that the six applications taken as a whole constituted important evidence of Greyhound's "continuing movement toward monopolization of the industry by selectively negating or neutralizing advantages held by [Trailways], its largest rival."[9] Trailways subsequently tendered a supplement to its exceptions, embracing "new evidence" concerning the impact that a grant of Greyhound's application would have on Trailways' systemwide operation.[10]

On 17 June 1980 a three-member commission panel (Division 1) issued a final decision granting Greyhound's application.[11] The Commission held that the arguments concerning potential systemwide harm, offered in Trailways' exceptions to the review board's decision "may not be considered, for this issue was not raised prior to the time this proceeding reached the petition stage."[12] It likewise denied Trailways' request that the ICC take official notice of the comments filed by Trailways in the other ICC proceeding, holding that the agency "may not give consideration to evidence contained in the records in those proceedings."[13] Trailways' subsequent peti-

---

2. Under this procedure, outlined in 49 C.F.R. 1100.43–1100.52, the parties submit written verified statements in lieu of oral testimony. This modified hearing procedure is intended to lend efficiency to what otherwise might require lengthy oral hearings.

3. Joint Appendix (J.A.) at 65–71.

4. *Id.* at 68.

5. *Id.* at 69.

6. *Id.*

7. *Id.*

8. *Id.* at 75–114.

9. *Id.* at 166–67.

10. *Id.* at 159–63. Trailways described the impact in terms of estimates of potential revenue diversions away from Arkansas and Trailways. The original estimate of $634,000 annually was

based on 50% of the estimated total of Little Rock inbound and outbound ticket sales. Trailways maintained that, even though the figures were estimates, they were conservative and represented the minimum revenue diversion probable. As it turned out, a more accurate estimate was possible after Greyhound made the required filing of its operations under its temporary service authority over the route in question. Based on the figures of Greyhound's "G.T.O.–18" filing which offered statistics generated during Greyhound's temporary authorization to provide the subject service, Trailways maintained that diversions would exceed $725,000 annually.

11. *Id.* at 166–68.

12. *Id.* at 167.

13. *Id.*

tion for review by the full Commission, arguing that the case involved issues of general transportation impact, was also denied.

Trailways filed a petition for review in this court on 27 June 1980. On 16 September 1980 an interim stay of ICC action granted by Chief Justice Burger was vacated, and an application for stay pending judicial review was denied. A certificate of public convenience and necessity has since been issued by the ICC to Greyhound authorizing commencement of the new service at Little Rock.

## II. DISCUSSION

### A. Scope of Review

The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be [inter alia,] arbitrary, capricious, an abuse of discretion, [or] . . . unsupported by substantial evidence." [14] Although there may be a significant practical overlap in courts' treatment of these two "standards" where both apply, they focus on two separate inquiries. The "substantial evidence" examination looks to whether the record, taken as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [15] It looks only for a rational basis for the agency's decision in the evidence on the record; it does not include the test of whether all relevant and important factors were actually considered or whether the decision was made for reasons other than those offered by the agency. This latter inquiry is part of the narrower "arbitrary and capricious" review, which looks specifically to whether the action was fully informed and well-considered —"whether the [agency's] decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." [16] Thus, as the Supreme Court acknowledged in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,[17] "though an agency's finding may be supported by substantial evidence, . . . it may nonetheless reflect arbitrary and capricious action." [18]

Although this case is a close one on the question of substantial evidence,[19] we are more concerned that the Commission's action under the circumstances was an abuse of its discretion and that its order cannot stand on the present record.

We are mindful of the broad expert discretion traditionally lodged in the ICC in considering and ruling on common carrier applications for authority to provide a particular service.[20] As broad as this discretion may be, however, it is not without limits.[21] Its exercise is not immune from a "thorough, probing, in-depth review," [22] and actions which fall outside the zone of the

---

**14.** 5 U.S.C. § 706(2)(A), (E) (1976). The "substantial evidence" test applies in cases subject to the adjudicatory procedures of 5 U.S.C. §§ 556 and 557. An application for a certificate of public convenience and necessity has been held by this court to be such a case. C & H Transp. Co. v. ICC, 589 F.2d 565, 571 (D.C. Cir.1978), cert. denied sub nom. Aero Trucking, Inc. v. C & H Transp. Co., 440 U.S. 911, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979) (involving an application under the original § 207 of part II of the Interstate Commerce Act, now substantially incorporated into 49 U.S.C. § 10922 (Supp. III 1979)).

**15.** National Council of American-Soviet Friendship, Inc. v. Subversive Activities Control Bd., 322 F.2d 375 (D.C.Cir.1963).

**16.** Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

**17.** 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

**18.** Id. at 284, 95 S.Ct. at 441.

**19.** See, e.g., observations in note 42, infra.

**20.** See United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–36, 66 S.Ct. 687, 697–98, 90 L.Ed. 821 (1946); ICC v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945).

**21.** See Burlington Truck Lines v. United States, 371 U.S. 156, 167–68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

**22.** Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

permissible discretionary function must be rejected. We find it necessary to do so in this case.

### B. *Public Convenience and Necessity*

Specific limits of the ICC's discretion to grant a carrier's application to provide service are contained in the language of the Interstate Commerce Act[23] itself. Principal among these is the provision that a certificate of authority shall be issued "*if* the Commission finds that ... the transportation to be provided under the certificate, is or will be required by the present or future public convenience and necessity."[24]

The Commission itself early described "public convenience and necessity" in motor carrier operations in terms of a three-pronged inquiry:

> The question, in substance, is [1] whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; [2] whether this purpose can and will be served as well by existing lines or carriers; and [3] whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.[25]

Rather than being a strict formulaic approach, this inquiry is one way of describing the ICC's duty to identify and balance often competing interests in promoting competition, maintaining healthy economic conditions, preserving an adequate existing service, and providing for future needs,[26] and to arrive at a decision that best serves the public interest. It is not for us to say what weight ultimately should be afforded the various elements of the Commission's balance in determining "public convenience

and necessity." That is a determination of fact which is the prerogative of the ICC, and it is not this court's role in the administrative arena to dictate an outcome or to reverse an agency's decision simply because we may not agree with it.[27] It is our duty, however, to ensure that the Commission has confronted all relevant—or at least significant—factors necessary to a reasoned decision. Where, as here, the contention is raised that the Commission refused or otherwise failed to address important issues of competition or control, we must closely scrutinize its action.[28]

### C. *Contentions of Systemwide Harm*

An essential element of the decisionmaking process, and one required by the APA, is that the ICC articulate clearly the basis for its action, including its findings on factual issues. Section 8 of the Act provides,

> The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of ... findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.[29]

This is not a requirement of an empty process of listing cursory findings and conclusions. Without clear disclosure of the agency's rationale, the reviewing court cannot fully perform its duty of evaluating the propriety of the Commission's actions, by whatever standard is appropriate. As stated by the Supreme Court in *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*,[30]

> A reviewing court must be able to discern in the Commission's actions the policy it

---

**23.** 49 U.S.C. §§ 10101 *et seq.* (Supp. III 1979).

**24.** *Id.* at § 10922(a)(2) (emphasis added).

**25.** *Pan-American Bus Lines Operations*, 1 M.C.C. 190, 203 (1936).

**26.** *Trans-American Van Serv. v. United States*, 421 F.Supp. 308 (N.D.Tex.1976).

**27.** *See Union Mechling Corp. v. United States*, 566 F.2d 722, 725 (D.C.Cir.1977).

**28.** *See Denver & R.G.W.R. Co. v. United States*, 387 U.S. 485, 498, 87 S.Ct. 1754, 1762, 18 L.Ed.2d 905 (1967).

**29.** 5 U.S.C. § 557(c)(A) (1976).

**30.** 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

is now pursuing so that it may complete the task of judicial review . . . .

\*　　\*　　\*　　\*　　\*　　\*

[A] simple examination of the order being received is frequently insufficient to reveal the policies that the Commission is pursuing. Thus, this Court has relied on the "simple but fundamental rule of administrative law," *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed.2d 1995 (1947), that the agency must set forth clearly the grounds on which it acted. For "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M., St. P. & P.R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).[31]

This principle has been the foundation of courts' analyses on many occasions.[32]

The thrust of Trailways' position is that the ICC's decision granting Greyhound authority to "open its doors" at Little Rock on its direct route between Memphis and Texarkana was made on an incomplete balance. Specifically, it argues that the Commission failed to consider the systemwide impact that a grant of Greyhound's application would have on Trailways, its subsidiaries, and the bus transportation industry in general. This is the issue with which the court is concerned. The record of the ICC's action in Greyhound's application does not clearly reveal whether the Commission understood the nature of Trailways' arguments and considered them in balancing the interests involved.

There is no question that the appropriate focus in Commission considerations of any adverse impact on other carriers, adverse also to public interest, is *systemwide*. This principle has been recognized by the Commission itself in other cases. In *Arrow Transportation Co.*,[33] the Commission categorically rejected the suggestion that it lawfully may focus its attention regarding potential harm more narrowly: "[T]he Commission intends to and does consider not only the effect of a competitive service in a proposed traffic lane, *but also the effect of a competitive service in protestants' overall operations.*"[34] In this case also the Commission agrees that the appropriate focus on any potential harm is systemwide. In fact it maintains in its brief that it "evaluated the potential harm to Trailways' overall operations—its system—as well as the harm to the Trailways' subsidiary that serves the traffic lane at issue, based on the evidence properly submitted by Trailways."[35] Unfortunately, a *post hoc* rationale offered on appeal does not fill a gap existing in the agency's contemporaneous explanation of its decision, nor therefore remedy a deficiency underlying the original action. There is a grand difference between what the Commission argues before this court and what the record shows, both in quantity and quality.

First, it is not at all clear that the Commission actually did look at systemwide harm to any degree. Second, even if we were to accord the ICC the benefit of our doubt to find that it did consider systemwide impact to some extent, its focus was shallow at best. The review board's decision evidences no confrontation with Trailways' principal contention that its evidence of systemwide harm should be considered in the context of the overall structure of the intercity bus market and of Greyhound's and Trailways' relative positions in that market.

1. *It is not clear that systemwide impact was considered.*

Trailways' protests before the Commission's review board were based on argu-

---

**31.** *Id.* at 805–07, 93 S.Ct. at 2373–74.

**32.** *E.g., Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *Argo-Collier Truck Lines v. United States*, 611 F.2d 149, 152–53 (6th Cir. 1979); *Humboldt Express v. ICC*, 567 F.2d 1134 (D.C.Cir.1977); *Monumental Motor Tours v. United States*, 316 F.Supp. 663, 668–70 (D.Md.1970).

**33.** 131 M.C.C. 941, 942 (1980), *appeal pending sub nom., Pacific Intermountain Express Co. v. United States*, No. 80–7251 (9th Cir.).

**34.** *Id.* at 942 (emphasis added).

**35.** Brief for the Interstate Commerce Commission at 23 n.11.

ments that a grant of authority to Greyhound to provide the Little Rock service would potentially result in significant traffic diversion and an annual revenue loss of more than $600,000, which would have an adverse impact on Arkansas Motor Coach and Trailways' competitive position in the market. Greyhound countered with an argument that Trailways' figure exaggerated the financial impact on Arkansas Motor Coach, because it was not prorated to reflect the losses only within Arkansas' area of service.[36]

The review board's decision acknowledged both Trailways' and Greyhound's arguments but made no specific finding.[37] As the Commission's Division 1 observed in reviewing that decision, "[I]t is not clear whether the review board accepted [Trailways'] representation, or agreed with applicant that petitioners' data exaggerate the potential harm."[38] The review board noted that "passenger and express traffic between the named points constitutes a considerable part of Arkansas' operations."[39] It stated, however, without any discussion, that it was "unable to conclude that the

potential diversion of this traffic which a grant might precipitate would materially adversely affect either Arkansas or its parent, Trailways."[40] The decision offers no indication of what this "potential diversion" might be; it states only that "the likelihood of substantial diversion of protestants' traffic is remote."[41] There is no articulated explanation of the basis for these findings, and the conclusory statements alone do not satisfy us that the review board considered impacts on the entire system, rather than impacts only on Arkansas' position as the carrier most directly affected in the Memphis-Texarkana corridor.[42]

### 2. The Commission failed to address Trailways' principal contentions.

Even if the review board actually did consider a potential systemwide impact of Greyhound's proposed service, as it contends, its focus was a shallow one, sidestepping the real issues involved. The Commission argues that it considered "all relevant decisional factors,"[43] balancing "the need for Greyhound's service against the small potential harm to Trailways if Greyhound

---

**36.** Trailways estimate was based on annualized figures from a study over a ten-day period in July 1979 of tickets sold at Little Rock for Memphis and points beyond, and Texarkana and points beyond. No survey was made of inbound traffic, but it was the witness' opinion that the volume of inbound traffic, over time, would roughly equal outbound traffic. It was offered that 50% of this total, or $633,910 ($\frac{1}{2}$ × $1,267,820) could actually be diverted. J.A. at 56–57.

**37.** *Id.* at 68.

**38.** *Id.* at 167.

**39.** *Id.* at 69.

**40.** *Id.*

**41.** *Id.*

**42.** There are other conclusions included in the board's decision which are unsupported on the record, and which, to the extent they may have influenced the ICC's conclusions, detract further from the Commission's contention that it carefully balanced all relevant factors. One conclusion in particular evidences a rather perfunctory approach to the whole matter by the ICC. In what we assume was an attempt to demonstrate a consideration of whether the "useful public purpose" benefitted by authorizing Greyhound's service to Little Rock "can

and will be served as well by existing carriers" ("element" 2 of the *Pan-American* guidelines, see text accompanying note 25 *supra*), the board's decision announced categorically that Arkansas "is unable to provide the entire proposed service." J.A. at 69. Not only does the board offer no basis for its conclusory statement on this factor, but the conclusion itself is unfounded on the record. Trailways concedes that because of deviations from the limited access highway for "about sixteen miles between Hope and Prescott, Arkansas (and along two minor segments at Little Rock and Memphis)," its existing service between Memphis and Texarkana, via Little Rock, does not match Greyhound's newly authorized route mile for mile. J.A. at 104–05. It maintains, however, that its transit times are allegedly "within a few minutes" of the transit time under Greyhound's schedule. This court has observed that "[w]hile we recognize that a finding of inadequacy of existing service is not always indispensible to the conclusion that the proposed service comports with public convenience and necessity, ... it is, nevertheless, an *important* factor in any section 207 determination." *C & H Transp. Co. v. ICC*, 589 F.2d 565, 573 n.16 (D.C.Cir.1978) (emphasis added). It follows that any relevant conclusion concerning this factor must be based on substantial evidence, which is lacking in this case.

**43.** Brief for the Interstate Commerce Commission at 20.

diverted some of its revenue."[44] It notes that the ICC's final decision, issued by Division 1, corrected an error in the review board's recitation of the figures offered as evidence of Trailway's potential revenue diversion, but otherwise, "the final decision adopted the discussion of the harm issue in the review board decision."[45]

The final Commission decision intimates that Trailways' evidence of revenue diversion was not enough to satisfy its burden of demonstrating adverse consequences, and further states, "Otherwise, petitioner's representations concerning potential system-wide harm may not be considered, for this issue was not raised prior to the time this proceeding reached the petition [for reconsideration] stage."[46] This conclusion avoids the essence of Trailways' arguments which accompanied its evidence of revenue diversion. Its contention, unanswered by the Commission at any stage of the administrative proceeding, was that, notwithstanding the benefits to Greyhound passengers using the altered specific service, in the long run *competition in the industry as a whole would not be promoted* by a grant of authority to Greyhound. On the contrary, it would be harmed, "for [the authority] will enable the dominant carrier, Greyhound, to grow larger at the expense of the competitor, Trailways."[47] Contrary to Division 1's observation in its final decision, this issue *was* raised before the review board.

We recognize that the "burden" commonly assigned to the protestant in an application case such as this has traditionally required more than a showing that the protestant will be harmed financially. The Commission itself has adopted a policy that competition is to be given more weight and less emphasis is to be placed on protecting existing carriers in evaluating applications for operating authority.[48] The *assumption* underlying this increase in the protestant's burden, however, clearly is that an application for new or expanded route authority is generally *pro*-competitive. This may be so in the great majority of cases, but not necessarily in all. The Commission should not become so enamored of procedural rules regarding burden of proof that it overlooks its perceived mission to preserve competition overall and its ultimate duty to protect the public interest.

The Supreme Court has described the Commission's role in considering an application, not as one which determines whether an applicant has sustained a burden of persuasion in the literal sense, but rather as a function of "weigh[ing] the competing interests and arriv[ing] at a balance that is deemed 'the public convenience and necessity.' "[49] In *Assure Competitive Transportation, Inc. v. United States*,[50] the Seventh Circuit found in this Supreme Court language support for "the Commission's suggestion that it may not be bound by the formal burden of proof requirements but instead is to evaluate the *totality of factors*."[51] The "totality of factors" in this case includes a market structure of which the ICC should be expertly aware and which Trailways should therefore not be bound to "prove" before using it as a basis for its argument.

The product of over forty-five years of government regulation since the enactment of the Motor Carrier Act[52] in 1935 is an intercity bus industry which unquestionably is largely dominated by Greyhound. The ICC itself acknowledged this dominate position in *California Parlor Car Tours Co.— Purchase—The Greyhound Corporation.*[53]

---

44. *Id.* at 21.

45. *Id.* at 23.

46. J.A. at 167.

47. *Id.* at 61.

48. Ex Parte No. MC–121, *Policy Statement on Motor Carrier Regulation* (30 November 1978); *see also Liberty Trucking Co., Ext.—General Commodities*, 130 M.C.C. 243, 246 (1978), *aff'd*, 131 M.C.C. 593 (1979), *aff'd sub nom., Assure Competitive Transp. v. United States*, 629 F.2d 467 (7th Cir. 1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981).

49. *Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 293, 95 S.Ct. 438, 445, 42 L.Ed.2d 447 (1974).

50. 629 F.2d 467 (7th Cir. 1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981).

51. *Id.* at 479 (emphasis added).

52. Part II of the Interstate Commerce Act, ch. 498, 49 Stat. 543 (1935) (codified as amended at 49 U.S.C. §§ 301–1150 (1976)) (revised in 1978 with the passage of the Revised Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.* (Supp. III 1979)).

53. 127 M.C.C. 343, 352 (1978).

The Commission in fact embarked upon a deliberate program in the 1960's to strengthen the Trailways' system in order "to make the system a more effective competitor of Greyhound." [54]

The record before us does not give any clear indication of exactly how large a portion of the bus market Greyhound holds. However, it does contain clear contentions by Trailways to the ICC and obviously relevant to the application:

> [E]very award of authority that this commission makes to Greyhound—because of Greyhound's already enormous domestic route system, the impact of single system service, and the like—tends to increase Greyhound's 70% market share (and reduce the market share of the rest of the industry) and to make it more difficult for existing carriers to compete with Greyhound and for additional competition to develop in the future.
>
> . . . .
>
> [W]hen one steps back from the application and takes into account the structure of the industry and, in particular, Greyhound's overwhelming dominance of it, the public interest considerations in a rejection of the Greyhound application are undeniable.[55]

We do not, of course, rule on the validity of these arguments; that is for the Commission alone to determine in its expert discretion, soundly exercised. We hold only that, whatever Greyhound's actual statistical position is in the market, whether it is actually monopolistic or not, an argument that it has a real ability to inflict harm [56] on its competitors should not lightly be discounted before granting it increased authority.

One of the express goals of the national transportation policy is "to encourage sound economic conditions in transportation, *including* sound economic conditions among carriers." [57] This court has stated before, and we reemphasize here, that "[i]njury to existing carriers through competition becomes relevant ... when there is corresponding injury to the public. Congress designed the Interstate Commerce Act to benefit the people, *not to create protected monopolies for those who profess to serve the public.*" [58] If the Commission is to be true to its duty in cases of this sort to balance convenience to the applicant and any adverse impact or injury to the public as a whole, the harm inflicted by a monopolist or a near monopolist on a vulnerable competitor, which Trailways claims to be, deserves especially careful attention. It received none in this case. We find in this failure alone sufficient reason to declare the Commission's ultimate conclusions and its decision arbitrary and capricious and to order that this matter be remanded for reconsideration.

### D. *Instructions On Remand*

We are aware that the "consideration" lacking in this case and called for on remand may require an in-depth study of the competitive structure of the intercity bus market to which an adjudicatory-type proceeding may not normally be conducive. We also do not ignore the discretion commonly accorded agencies in the ordering of their own proceedings. We are simply concerned that by a combination of circumstances the ICC has been able to evade an important, even if it is also likely to be a difficult, element of a reasoned decision on Greyhound's application—the matter of assessing the structure of the bus market and determining if there is any detriment to public interest arising from the incremental impact on Trailways' competitive position of granting Greyhound an authority which, in all other respects, seems quite reasonable.

---

54. *Interstate Investors, Inc. v. United States*, 287 F.Supp. 374, 391 (S.D.N.Y.1968), *aff'd*, 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969).

55. J.A. at 78, 110.

56. This ability has been recognized in other cases, *see, e.g., Greyhound Corp. v. Mount Hood Stages, Inc.*, 437 U.S. 322, 337, 98 S.Ct. 2370, 2378, 57 L.Ed.2d 239 (1978).

57. 49 U.S.C. § 10101 (Supp. III 1979) (emphasis added). The Supreme Court has observed that "[t]he very fact that Congress has seen fit to enter into comprehensive regulation of [in that case, the communications industry] ... contradicts the notion that national policy unqualifiedly favors competition." *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed.2d 1470 (1953). *Cf. Hawaiian Tel. Co. v. FCC*, 498 F.2d 771 (D.C.Cir.1974) (entire theory of government regulation is based on a belief that competition is not the effective regulator in some industries that it is in others).

58. *May Trucking Co. v. United States*, 593 F.2d 1349, 1356 (citing numerous decisions of the Commission) (emphasis added).

As noted in the facts, at the time this single case came before the Commission, the Commission had four other cases involving Trailways challenges to Greyhound applications, which it afterwards consolidated, and another single case which it did not.[59] However, after the Commission had acted on the application at issue here, Greyhound prudently dismissed all four of the applications which had been consolidated. The vehicle of a consolidated proceeding thus is no longer available to determine the broad issue of any potential anticompetitive impact of Greyhound's activities. At oral argument the Commission pointed to a third procedure, a rulemaking begun in 1979, as the appropriate forum in which the competitive positions of Greyhound and Trailways would be evaluated. Under normal circumstances, we would accord the greatest deference to this argument. However, the Commission has suspended further development of this rulemaking proceeding on the ground, also prudent, that Congress is engaged in a look at the whole motor carrier industry, and at the intercity bus industry in particular, and that it would be a waste of the Commission's time to continue with this rulemaking proceeding.

The sum and effect of these circumstances is that the Commission, by one way or another, has evaded or otherwise missed a full consideration of the broad question of the long-term effects of incremental increases of Greyhound's market share on the greater public interest of which the ICC is statutory guardian. We find Trailways' argument to the Commission persuasive: even in a "small" authority application, an award which eliminates a competitive edge in a carrier other than Greyhound is an effective shift of that edge to Greyhound and a contribution to an already dominant position in the market.[60] The Commission should not allow Greyhound to grow larger without careful and detailed examination of

*all* aspects of public interest, including the long-range interest in continuing competition in the market.

We normally would be reluctant to direct the Commission to take up this issue in any particular proceeding. However, when after several years the issue of an anticompetitive systemwide impact, vital to reasoned decisions in individual certification proceedings involving both Greyhound and Trailways, remains unaddressed, it is time that it be considered in at least some proceeding. We hold here only that the Commission may no longer fail to consider this issue and still engage in reasoned decisionmaking.

The breadth of what on remand should be a careful examination of market structure and impact may prompt the Commission to permit the parties to introduce broad legislative-type evidence relevant to the issue of the overall impact of Greyhound authority over Trailways' operations. Trailways sought to introduce similar evidence before Division 1 in the form of "comments which it recently had filed in a pending Commission proceeding,"[61] by requesting that the Commission take official notice thereof. The Commission refused to do so, holding that "while we may take official notice of other Commission proceedings and the findings therein, *we may not give consideration* to evidence contained in the records in those proceedings."[62]

We are not necessarily satisfied with Trailways' timing or with the manner by which it attempted to introduce this material into the proceeding under review. The Commission and Greyhound both raise valid points that the admission of this evidence at the time it was offered may have had the effect of cutting out Greyhound's chance to reply to the material involved. Had the Commission actually exercised its discretion and decided that the circumstances dictated that it not notice the record in the other

---

**59.** The Fifth Circuit case was disposed of by order without published opinion. *Trailways, Inc. v. ICC*, 656 F.2d 698 (1981).

**60.** J.A. at 77.

**61.** Brief for Petitioners Trailways, Inc., *et al.*, at 22. These comments are described as containing

an exhaustive analysis of the interdependence of the various segments of the Trailways and NTBS [National Trailways Bus System] route systems, in the "ripple effect" on the entire system of significant traffic

diversions on any one route, such as Little Rock. They also addressed the structure of the intercity bus industry and Greyhound's competitive advantages—such as its superior "feed" traffic, its intrastate monopoly routes, and its dominance of vertically related areas such as bus manufacturing, terminal facilities, bus repair facilities—which intensifies its capacity to accomplish substantial traffic diversions from its weaker competitors such as Trailways.

*Id.* at 23.

**62.** J.A. at 169 (emphasis added).

proceeding, we would be hard pressed to find issue with that decision. In this case, however, the Commission's decision was *not* an exercise of discretion one way or the other; it was bottomed squarely upon a statement and apparent belief that the ICC *could not* lawfully notice the record in the other proceeding. In this it was clearly wrong.

The controlling standards on this issue were established over a quarter-century ago in a case which, like this one, involved the power of the ICC in a motor carrier licensing proceeding to take official notice of evidence adduced in another proceeding. In *United States v. Pierce Auto Freight Lines, Inc.,*[63] the Supreme Court held that as long as all parties in the case at bar were also parties to the other proceeding, the consideration of evidence adduced in the other proceeding cannot be prejudicial and is entirely lawful.[64] The Commission itself recently restated the correct standard in *Airfield Service Co. Extension—Bradley International Airport :*[65]

> The Commission, of course, may properly take official notice of reports issued in other proceedings before it. It may also properly take official notice of the record in such other proceedings if the parties in the instant and prior proceeding are the same, or there, at least, are no new or different parties in the instant proceeding.[66]

Greyhound and Trailways are both parties to the proceeding for part of whose record evidence Trailways sought official notice.[67] It therefore would have been entirely lawful for the Commission to take official notice in the instant proceeding of the comments filed in the rulemaking. Of course, the Commission also had discretion not to notice the evidence at issue by deciding that it would be unduly prejudicial to Greyhound to do so (although an opportunity to reply would seemingly have avoided this), but it did not exercise even this discretionary prerogative. It was clearly wrong in concluding simply that it had no power to notice it.

We expect, upon remand, that this evidence or any other evidence bearing on the issue will be introduced by both sides, according to the preferred Commission procedures. The final determination of the weights to be accorded such evidence, and its persuasive value in satisfying the "burden" upon Trailways to show material harm sufficient to justify a refusal of the Greyhound authority is of course a matter for the Commission.

### III. CONCLUSION

In the examination of applications for new or altered service, the matter of short-term convenience is only one aspect of the public interest which the ICC's regulatory power was created to protect. We find no issue with Greyhound's contention that its service to Little Rock on the more direct route, utilizing interstate highways, is more efficient than its existing service, provides a more pleasant passage for users of its system, and that there is some public interest in such convenience. Trailways claims, however, that a broader public interest is served by refusing to grant authority which tends to increase Greyhound's dominant share of the intercity bus market. Whether this is so in the ultimate analysis is not a question before this court.

It should have been before the Commission; that this contention was not addressed compels the remand. This is not a case involving merely an evaluation of the *weight* of relevant factors; it involves instead a decision made on an incomplete analysis of the "public convenience and necessity" limiting the Commission's discretion. We vacate the order under review granting Greyhound's application, and remand this matter for those proceedings and deliberations which the Commission deems appropriate to a full consideration of market-related issues, and any others pertinent to the action requested.

*So ordered.*

### ON PETITION FOR REHEARING
### ORDER

#### PER CURIAM.

On consideration of intervenor Greyhound's petition for rehearing, it is

---

**63.** 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

**64.** *Id.* at 528–30, 66 S.Ct. at 694–95. *Accord, NLRB v. Harrahs Club,* 403 F.2d 865, 873 (9th Cir. 1968); *Moon v. Celebrezze,* 340 F.2d 926, 929 (7th Cir. 1965); *Blue Bird Coach Lines, Inc. v. United States,* 328 F.Supp. 1331, 1336 n.10 (W.D.N.Y.1971) (involving an application for intercity bus authority).

**65.** 121 M.C.C. 765, 778 (1975).

**66.** *Id.* at 778.

**67.** Ex parte No. MC–133, *Petition for Rulemaking on Entry Flexibility for Regular Route Passenger Carrier.*

ORDERED by the Court that the petition for rehearing is denied.

A statement of the panel is attached.

## MEMORANDUM

*Per Curiam*: We have carefully considered Greyhound's petition for a rehearing in this case and have reexamined our opinion to eliminate any ambiguities which might be misread as appellate-level fact-finding. Except to the extent that it has enabled us to identify potential ambiguities (two minor changes), we find Greyhound's arguments unpersuasive. The purpose of the principal opinion in this case was to advise the ICC that it had overlooked or evaded an inquiry necessary to a reasoned decision. The opinion accomplished our purpose. We deny the petition.

In doing so we feel constrained to comment on the tone of Intervenor-Respondent's petition and to suggest that counsel who drafted it have cause to ponder their choice of words. The petition is cast almost entirely in terms of a personalized attack on the writer of the opinion, ignoring the fact that the court was *unanimous* and that the decision and opinion reflected the views of all three judges. In one paragraph, for example, it is asserted that the writer's "decision reflects antipathy toward the ICC," and that "[t]o cure what at most may be an inartistically written decision" the applicant on remand will be subject to an "unruly proceeding at which it will be the target for further character assassination." Intervenor-Respondent's Petition for Rehearing at 13–14. More could be quoted, but these excerpts give flavor enough.

We find such language repugnant to an atmosphere of decorum and civility in the appellate process. It would not be acceptable in referring to the brief of opposing counsel, much less to the opinion of a unanimous court. It is not only ill-mannered, it is ineffective.

In this case, we considered directing the Clerk to return this petition, but since from time to time there have been others couched in tones similar, we thought it more effective to state the court's reaction to this one and to reserve summary rejection for the next (if any) such petition filed.