611 F.2d 149
 ARGO-COLLIER TRUCK LINES CORPORATION and Refrigerated
Transport Co., Inc., Petitioners-Appellees,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents-Appellants.
Watkins Motor Lines, Inc., Intervenor.
 No. 77-3373.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 17, 1979.
Decided Dec. 13, 1979.
 
 Richard M. Tettelbaum, Serby & Mitchell, P. C., Bruce Mitchell, Atlanta, Ga., for respondents-appellants.
 Griffin Bell, Atty. Gen. of United States, Dept. of Justice, Washington, D. C., Robert B. Nicholson, Robert Wiggers, Gen. Counsel, L. Marie Guillory, I. C. C., Washington, D. C., for petitioners-appellees.
 Before CELEBREZZE, BROWN and KENNEDY, Circuit Judges.
 CORNELIA G. KENNEDY, Circuit Judge.
 
 
 1
 Petitioners Argo-Collier Truck Lines (Argo) and Refrigerated Transport (Refrigerated) established carriers, seek to have reviewed and set aside the order of the Interstate Commerce Commission (ICC) certifying Watkins Motor Lines (Watkins) as a common carrier of foodstuffs from Illinois to points in several southeastern states. The application of Watkins, supported by shipper Anderson Clayton Foods (Anderson), was filed March 24, 1974. As a petitioner seeking a new grant of authority, the burden is upon Watkins to prove such a grant is supported by the public convenience and necessity. Ace Doran Hauling & Rigging Co. v. United States, 545 F.2d 1046, 1047 (6th Cir. 1976).
 
 
 2
 Review Board Number 2 of the ICC initially denied Watkins' application. It held that although the shipper indicated new products were continually being developed, it stated no definite plans for expansion. (App. 190); that while the shipper made general complaints of availability of equipment no specific problems were alleged; (App. 191); that Argo had underused equipment in the Jacksonville area and that Refrigerated was capable of carrying additional traffic; (App. 191) and that indeed there was no specific complaint by Anderson about the existing service (App. 191). On the basis of the evidence presented and relying on the principle that existing carriers are entitled to transport all traffic they can handle adequately and efficiently the Review Board concluded the application should be denied.
 
 
 3
 Following the applicant's request for reconsideration, however, Division 1 of the ICC reversed the prior decision and granted certification, Watkins Motor Lines, Inc., Extension, 125 M.C.C. 713 (1976). It found that the shipper planned a reduction of rail service and warehousing and had developed a new need for carriers with multiple-delivery, multiple-stop-off capacity, Id. at 715; that service was occasionally unavailable, Id. at 715-16; and that carriers are generally unwilling to deadhead equipment from Chicago, where most Illinois shipments terminate, Id. at 716. It further found that the shipper had no intent to divert traffic from Argo and Refrigerated, Id. at 716, and that direct service in place of the use of rail and warehousing would be of real benefit to the shipper, Id. at 717. Finally, the ICC held that the ability of protestants to provide additional service to meet the increased volume was unclear and that Argo and protestants would suffer no material adverse effects from the granting of the application. Id. at 718.
 
 
 4
 Petitioners challenge the ICC's decision on the grounds that it was arbitrary and capricious and an abuse of discretion in that it is unsupported by substantial evidence. Administrative Procedure Act, 5 U.S.C. § 706(3)(A) and (E). As stated in Bowman Transportation v. Arkansas-Best Freight System, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1975):
 
 
 5
 Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment . . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. 814, 28 L.Ed.2d 136. The agency must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 
 6
 419 U.S. at 285, 95 S.Ct. at 442.
 
 
 7
 In passing on a petition for additional authority, the ICC is required to determine whether the new service will serve a useful purpose and be responsive to a public need; whether existing carriers do or can provide the service; and whether the additional authority would endanger or impair the ability of existing carriers to serve the public need. West Nebraska Express, Inc., Extension, 118 M.C.C. 423, 427 (1973); Pan-American Bus Lines Operation, 1 M.C.C. 190, 203 (1936). It is the ICC's duty to identify the competing interests and then to strike a reasonable balance. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra. In most cases, the ICC is to identify and resolve the often conflicting interests in promoting competition, maintaining sound economic conditions, preserving an adequate existing service, and providing for future needs. Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308 (N.D.Tex.1976). It is not only the duty of the Commission to make findings of fact on these interests and to exercise reasonable judgment in resolving them, Chesapeake & Ohio Railway Co. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824 (1931), but also to make a statement on the record including "findings and conclusions, and the reasons or basis therefore, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(A); Humboldt Express, Inc. v. ICC, 186 U.S.App.D.C. 141, 146, 567 F.2d 1134, 1139 (D.C.Cir.1977). These articulated findings must be supported by substantial evidence in the record. ICC v. J-T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).
 
 
 8
 It is essential to the decisionmaking process that the ICC articulate clearly its findings on the factual issues which form the basis for its decisions. Without such findings, a reviewing court is unable to perform its function of ascertaining that the ultimate conclusions are derived from the record before the agency and not the result of discretion exercised in an arbitrary and capricious manner. Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308, 319 (N.D.Tex.1976). Without such findings, the reviewing court must either suspend its critical judgment in affirming the agency or search out reasons which could support the agency decision, Humboldt Express, supra, at 1137, or reverse or remand. The rights of the parties also depend on the adequacy of fact finding by the agency. The ICC owes a duty to those who appear before it to address their arguments, unless frivolous, Pitre Brothers Transfer, Inc. v. United States, 580 F.2d 140, 144 (5th Cir. 1978). "A party is entitled, of course, to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 288 n.4, 95 S.Ct. 438, 443, 42 L.Ed.2d 447 (1974).
 
 
 9
 In the present case both the record created by the parties and the findings made by the ICC suffer from a failure to articulate clearly the facts which are asserted. This is particularly true of the facts asserted by Watkins, who as applicant has the burden of proof. The ICC, for its part, did not set forth the bases for its findings and did not address the assertions of error vigorously argued by the petitioners. In many instances there is simply no evidence in the record for particular findings of fact. As a result the decision must be reversed as not supported by substantial evidence and the application of Watkins denied.
 
 
 10
 The ICC found first that a reduction of rail service and warehousing, that is, a change in Anderson's methods of distribution, necessitated a new need for multiple-delivery, multiple-stop-off capacity. 125 M.C.C. at 715. The evidence in the record on this point is that there has been a growing demand by customers for shipment in refrigerated trucks (App. 26) and that currently some tonnage is moved by rail (App. 30). The shipper expressed an expectation that the company would in the future develop new products (App. 24) and that handling in transit was to be avoided because many items were perishable (App. 25). Anderson required multiple-stop-off capacity and prompt service, as well as the ability to handle loads of mixed items (App. 27-28). Argo stated that it has a call-and-demand service with multiple-stop-off capacity and offers less-than-truckload service. (App. 59). Its trucks are refrigerated. Its verified statement discloses that its present equipment is not used to full capacity and that it was capable of handling twice the shipper's total tonnage into the territory involved. (App. 60). Although there is ample support for the finding that Anderson requires shippers with multiple-delivery, multiple-stop-off capacity, there was no evidence the need was new. Petitioners had been supplying this service.
 
 
 11
 The ICC found that motor service has occasionally been unavailable. 125 M.C.C. at 715-16. The only evidence to support this finding is the following statement by the shipper.
 
 
 12
 This problem which we have experienced in shipping from Jacksonville to Southeastern states is that the supply of refrigerated truck equipment for southbound movement is tied closely to the equipment handling the northbound flow of perishable commodities from the Southeast to the Midwest. This shortage in southbound equipment can be seasonal, or can became a truck service factor in any given week of the year. We have had occasions where we have had to delay shipments until truck equipment was available, or ship by rail where possible.
 
 
 13
 (App. 33). Both protestants stated that they have never responded to a service request late or been unable to provide service (App. 65, 163-64). Refrigerated asserted that it has had more than an adequate number of units terminating in Illinois and available to Anderson upon request, even in the slack months of June, July, and August (App. 162). Argo regularly maintains fifteen tractor-trailers at Jacksonville for the exclusive use of Anderson (App. 60). The shipper's statement, since it specifies no time could refer to a period before Argo constructed its Jacksonville terminal. The delay, stated to be occasional, could also be negligible in duration. It may have been delay caused by some other carrier. (There were other protestants besides petitioners). In view of petitioners' very specific denials of late service the general statement, "We have had occasions where we have had to delay shipments until truck equipment was available," is not substantial evidence that the shipper has experienced problems in obtaining a sufficient supply of carrier equipment from petitioners.
 
 
 14
 The ICC found that motor carriers are unwilling to deadhead to Jacksonville from Chicago, where most northbound shipments end. 125 M.C.C. at 716. Anderson did assert that carriers are reluctant to deadhead 224 nonrevenue miles to Jacksonville. However, Argo argued that it maintains a terminal less than one mile from Anderson's plant in Jacksonville for the exclusive use of Anderson (App. 61), has fifteen trailers there for the sole purpose of serving Anderson (App. 60), and thus has no need to deadhead to Jacksonville. Furthermore, Argo stated that it has shipments terminating at nearby points from which it is willing to dispatch equipment upon demand to Jacksonville. (App. 63). According to Argo, in the first seven months of 1974, it had 982 idle units at Chicago on a daily basis, all of which would have been made available to the shipper upon request (App. 63). In fact, Argo stated, it had to send its permanent Jacksonville equipment elsewhere for lack of shipments by Anderson during the first six months of 1974 (App. 63). Refrigerated also stated that it would provide any trucks requested by Anderson and in fact has found it necessary to deadhead from Chicago out of the State of Illinois (App. 162-64, 229-30). There is thus sworn evidence in the record of a willingness and ability to provide trucks to Anderson, even at the cost of deadheading equipment 224 miles.
 
 
 15
 The ICC found that the shipper had no intent to divert traffic from protestants. 125 M.C.C. at 716. Anderson did state that it did not expect any diversion of traffic from the present carriers (App. 30). The protestants, however, dispute this expression of intent. According to Argo and Refrigerated, there is currently not enough traffic for the existing carriers.
 
 
 16
 Failure to fully utilize our equipment at Jacksonville in the first six months of this year resulted in solicitation efforts with Anderson, Clayton Foods. This shipper explained that business in general was soft and the vegetable market was fluctuating. . . .
 
 
 17
 Any loss of Argo's present traffic will jeopardize the continuance of its terminal facility at Jacksonville which is maintained exclusively for the convenience of Anderson, Clayton Foods.
 
 
 18
 (App. 64). Moreover, Refrigerated stated, contrary to the shipper's statement of intent, that it has in fact experienced a serious diversion of traffic which has reduced its shipments for Anderson from eight to ten loads per day to thirty shipments total from March through August 1974 (App. 160-62), a reduction of about 90%. During this time, it had 100 units terminate in Illinois, in the three slack months of June, July, and August alone (App. 162). Regardless of the shipper's statement of its intent, service by Watkins will result in the diversion of traffic from petitioners.
 
 
 19
 The ICC held that Refrigerated did not have equipment located near Jacksonville. It stated that Refrigerated terminated all Illinois shipments in Chicago, 125 M.C.C. at 716-17, and concluded that Watkins could thus offer superior service. It appears from the record however, that all of Watkins' shipments into Illinois also terminate at Chicago (App. 16-17). It is thus impossible to perceive in what way it can provide superior service or respond to requests in a shorter period than Refrigerated.
 
 
 20
 The ICC next concluded that it was not clear that the protestants could provide additional service to meet the increased volumes required by the shipper. 125 M.C.C. 718. The evidence in the record indicates that Argo had 982 idle units at Chicago on a daily basis which it would have made available to Anderson on 6.5 hours notice (App. 63). In addition, it stated that "Argo is willing to provide additional equipment for basing at the Jacksonville, Illinois terminal." (App. 63-64). Refrigerated stated that it held a lot of authority into Illinois and needed southbound traffic in order to avoid deadheadings, delays, and waste of gasoline (App. 160-64). As stated above, both Argo and Refrigerated have been called into service less frequently recently than formerly. Respondents' brief states that Watkins terminated 242 units in Illinois in 1974, substantially less than Argo. Thus, no reason appears to suggest why Argo and Refrigerated could not once again fulfill demands not only at their former levels, but as high as Watkins could.
 
 
 21
 The ICC finally held that it found no material adverse effects resulting to the protestants from a grant of authority to Watkins. 125 M.C.C. at 718. The evidence in the record indicated that a dilution in shipments which Argo makes for Anderson would "have an adverse effect on continuous and dependable service for all of its certificates." (App. 58). Argo stated its concern that the entry of Watkins might necessitate its closing the Jacksonville terminal since it would no longer be economically wise to maintain trucks there on a permanent basis. (App. 64). This would be particularly undesirable since it has made substantial outlays for its Jacksonville terminal (App. 215). As previously stated, Refrigerated has already experienced serious losses in the demands made upon it. Further losses to either protestant would obviously constitute a serious problem to them and most likely to the public which they serve.
 
 
 22
 It is evident from the facts in the record that there is no substantial evidence to support the conclusions drawn by the ICC. The great weight of the evidence points to the opposite conclusion on almost every finding reached in the opinion on Watkins' motion for rehearing. It is also troubling that the ICC failed to address points of error which were clearly not frivolous and which the protestants urged with vigor. In instances admitting of any doubt, the ICC resolved them in favor of the applicant, contrary to the burden of proof then upon Watkins. With the basis for its conclusions not clearly articulated, the reviewing court must be left with the suspicion that the decision was made for a reason not stated in the record: solely for the purpose of increasing competition in the area in disregard of other policies articulated by Congress. "The very fact that Congress has seen fit to enter into the comprehensive regulation . . . contradicts the notion that national policy unqualifiedly favors competition . . . . The Act by its terms prohibits competition by those whose entry does not satisfy the 'public interest' standard." F.C.C. v. RCA Communications, Inc., 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed. 1470 (1953). Thus, although existing carriers are not given complete immunity from competition, the grant of additional service must be found to serve the public interest as articulated by Congress. Onley Refrigerated Transportation Inc., 118 M.C.C. 715, 722 (1973).
 
 
 23
 The ICC is required to balance the public interest in promoting competition with the need to maintain sound economic conditions in the industry through the entry of newcomers. Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308 at 324 (W.D.Tex.1976). Congress plainly stated: "It is hereby declared to be the national transportation policy of the Congress . . . to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers." 54 Stat. 899, § 1 (Sept. 18, 1940); O-J Transport Co. v. United States, 536 F.2d 126, 131 (6th Cir. 1976), Cert. denied, 429 U.S. 960, 97 S.Ct. 386, 50 L.Ed.2d 328 (1976). The ICC has long been concerned with preventing unfair and destructive competitive practices. Pan-American Bus Lines Operation, 1 M.C.C. 190, 209 (1936). It is evident that competition may create waste injurious to an existing carrier's ability to compete, with resulting injury to the public, May Trucking Co. v. United States, 193 U.S.App.D.C. 195, 202, 593 F.2d 1349, 1356 (D.C.Cir.1979), through inefficient service, Terminal Transport Co., 103 M.C.C. 699, 715-16 (1967), and unnecessary and wasteful expenditures. Chesapeake & Ohio Railway Co. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824 (1931). Neither the promotion of competition nor the avoidance of unsound practices is to be the paramount policy. Both are to be balanced with the other relevant factors and a decision made by the ICC on the basis of the facts in the record. Midwest Coast Transport, Inc. v. ICC, 536 F.2d 256, 260 (8th Cir. 1976). The opinion is thus a decision reached as a result of improper weight given to one factor and is therefore arbitrary and capricious.
 
 
 24
 The ICC on October 17, 1979 adopted the following policy:Applications for motor carrier authority will henceforth be granted upon applicant's showing that proposed service is responsive to useful public purpose and that it is fit to perform such service, unless established carriers demonstrate that granting application would endanger their operations contrary to public interest.
 
 
 25
 48 U.S.L.W. 2301 (Oct. 30, 1979). Although it may be that the certificate should not issue even under this new policy on the basis of the record before the court, that record was created in response to the prior policy of the ICC. Moreover, it is for the Commission and not the court to pass upon such a question in the first instance and to strike the appropriate balance. Burlington Truck Lines v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Under the circumstances, the parties may seek to reopen the record if there is additional material evidence which should be presented to the ICC. Accordingly, the decision of the ICC is reversed and remanded to the ICC to determine whether the record should be reopened to permit further proceedings consistent with the court's opinion.