766 F.2d 1537
 247 U.S.App.D.C. 119
 TRAILWAYS LINES, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Greyhound Lines, Inc., Peter Pan Bus Lines, Inc., Seashore
Transportation Company, et al., Intervenors.
CAROLINA COACH COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Greyhound Lines, Inc., Intervenor.
 Nos. 84-1039, 84-1043.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 11, 1985.
Decided July 12, 1985.
 
 Petitions for Review of an Order of the Interstate Commerce commission.
 Betty Jo Christian, Washington, D.C., with whom Timothy M. Walsh, Washington, D.C., was on brief, for petitioners. Robert Lewis Thompson, Washington, D.C., entered an appearance for petitioners.
 Essie F. Stevens, Atty., I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Robert S. Burk, Acting Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I.C.C., Robert B. Nicholson and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents. John Broadley and Colleen J. Bombardier, Washington, D.C., entered appearances for respondents.
 E. Barrett Prettyman, Jr., Washington, D.C., with whom George W. Mayo, Jr., and David F. Grady, Washington, D.C., were on brief, for intervenor Greyhound Lines, Inc.
 Lawrence E. Lindeman, Washington, D.C., was on brief, for intervenor Peter Pan Bus Lines, Inc., et al.
 Before WRIGHT, SCALIA and STARR, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 These petitions for review return this court to the arena of bus regulatory reform created by Congress' enactment in 1982 of the Bus Regulatory Reform Act, Pub.L. No. 97-261, 96 Stat. 1102 (1983) ("BRRA"). In proceedings before the Interstate Commerce Commission, Greyhound sought and was granted additional route authority throughout the Nation for regularly scheduled intercity bus service in the face of protests by various Greyhound competitors. Having lost before the ICC, the protestants now seek review of the agency's adverse decision. For the reasons that follow, we deny the petitions for review.
 
 
 2
 * The BRRA is designed to reduce substantially federal regulation of the intercity bus system. In fashioning the BRRA, Congress anticipated that decreased regulation would, by creating competition in market situations where service by only one carrier had previously existed, increase carrier efficiency and enhance service to the public. Before the BRRA's passage, it was virtually impossible for a bus company either to enter a route already served by another carrier or to discontinue a route which the company was then serving. By virtue of the BRRA, it became substantially easier for a carrier either to obtain a new route or to discontinue an unprofitable route.
 
 
 3
 At the same time, the BRRA did not work total deregulation of the intercity bus system. Under current law, if a carrier desires to enter a route served by another carrier, the new carrier must tender a "public interest" application under 49 U.S.C. Sec. 10922(c) (1982).[1] By virtue of the pro-competitive BRRA regime, the Interstate Commerce Commission is obliged to grant the application if the applicant can show that it is fit, willing, and able to serve the route, unless a protestant comes forward and affirmatively demonstrates that granting the application would be inconsistent with the public interest. In determining whether a protestant has carried its burden of proof, the Commission is, "to the extent applicable," to consider four factors enumerated in the statute. Those factors provide the benchmarks for our analysis, and we therefore set out the pertinent statutory language:
 
 
 4
 (A) the [national] transportation policy [as set forth in] section 10101(a) of [Title 49];
 
 
 5
 (B) the value of competition to the traveling and shipping public;
 
 
 6
 (C) the effect of issuance of the certificate on motor carriers of passenger service to small communities; and
 
 
 7
 (D) whether issuance of the certificate would impair the ability of any other motor common carrier of passengers to provide a substantial portion of the regular-route passenger service which such carrier provides over its entire regular-route system....
 
 
 8
 49 U.S.C. Sec. 10922(c)(3) (1982).[2] Each of the four enumerated factors is to be given equal weight by the Commission in ruling on an application.
 
 II
 
 9
 Greyhound Lines is the dominant carrier of passengers in the intercity bus industry, having "captured up to 71 percent of the regular route or scheduled intercity bus transportation market, whereas its only national competitor, Trailways, Inc., has a market share of about 21 percent." Greyhound Lines, Inc., Extension--One Hundred Fourteen Routes, No. MC-1515 (June 29, 1983), App. B. at 1, J.A. at 1, 18 [hereinafter cited as ALJ Decision]. Trailways is a member of the National Trailways Bus System ("NTBS"), an association of forty-nine independent carriers that coordinate schedules, share a common trade name, and cooperate to offer nationwide service. Petitioner Carolina Coach Company is also a member of NTBS, as are intervenors Seashore Transportation Company, Capital Motor Lines, and Colonial Trailways.[3]
 
 
 10
 * This case began in January 1983 when Greyhound filed applications to serve 147 new routes. In response, petitioners[4] filed discovery requests with the ICC for information and documents on Greyhound, as well as interrogatories, which they deemed relevant to the BRRA's four public-interest criteria,[5] as set out above. The Commission, however, remained mute in the face of these discovery requests as of the date on which protests to Greyhound's applications were due to be filed. The petitioners thereupon filed in a timely manner protests to twenty-nine of the proposed routes; the other 118 routes were automatically granted, as provided for under the BRRA's pro-entry provisions.
 
 
 11
 In its response to the protests, Greyhound set forth its proposed schedules for the new routes, representing that its planned service was modest in extent, namely on the order of one to four buses a day for most routes. J.A. at 1188-89. Greyhound's applications were thereupon referred for decision to an Administrative Law Judge; in an ensuing prehearing conference, the ALJ ordered Greyhound to produce (1) its revenue projections on the proposed routes; (2) information on the ownership of bus terminals; and (3) information as to which carriers were allowed to use those terminals. J.A. at 2249. Greyhound provided the full panoply of information as to bus terminals, but at a conference in June 1983, Greyhound informed the ALJ that it had neither formulated revenue projections nor conducted market research or surveys with respect to the proposed routes. J.A. at 2269-70. It would appear that Greyhound did not develop such data because the routes under protest were, as the ALJ stated, "designed to mesh with existing operations" of Greyhound. ALJ Decision, J.A. at 4. Moreover, addition of the new routes did not require any capital investment by Greyhound. J.A. at 2271.
 
 
 12
 Greyhound further represented during the June 1983 conference that, in preparing its applications, it had relied principally upon the operating experience and business judgment of its Senior Director of Operations, Ernest Simmons. J.A. at 2270. The ALJ offered the petitioners the opportunity to depose Mr. Simmons during the prehearing conference. J.A. at 2246. However, the protestants did not seek to interrogate Mr. Simmons apparently because, in their view, they needed more documentation from Greyhound before they could mount a meaningful examination of the prospective witness. Petitioners' Brief at 12 n. 21. The ALJ thereupon denied all of the protestants' discovery requests. J.A. at 2291.
 
 
 13
 As to the substantive issues, the protestants attempted through written submissions[6] to demonstrate that approval of Greyhound's applications would not be in the public interest as defined by the four statutory factors. Invoking the third and fourth factors in particular, petitioners argued that if Greyhound's applications were approved, each protestant would suffer a diversion of its own traffic sufficiently grave as to force each competing carrier both to reduce greatly the level of service to small communities and to cut back substantially on its entire system. Furthermore, the protestants argued that the ALJ could not properly evaluate the impact of Greyhound's expansion on the dominant carrier's competitors unless a more comprehensive analysis were first undertaken of the long-term effects on competition in the intercity bus system which would be wrought by the new authority. Specifically, the protestants argued that, by virtue of Greyhound's dominant position in the industry, each incremental increase in market share by Greyhound rendered problematic the competitive situation of non-dominant carriers, all of which are considerably smaller than Greyhound; thus, the argument ran, any new grant of authority to Greyhound would be destined to result in a diminution of competition. In the competitor's view, a global study of the industry, if undertaken by the Commission, would demonstrate that, were Greyhound continually awarded small increases in route authority, the result at day's end would be the virtual elimination of competition. In this respect, petitioners invoked this court's decision in Trailways v. United States, 673 F.2d 514 (D.C.Cir.1982), rendered prior to the BRRA's passage; in Trailways, this court had held that the ICC was obligated to determine whether any detrimental impact on the public interest would be occasioned by granting Greyhound authority that had an incrementally adverse effect on Trailways' competitive position. Id. at 522. The ICC had never made such a Trailways-mandated determination, and the protestants argued to the ALJ that the ICC was still obliged to do so notwithstanding the supervening event of Congress' passage of the BRRA.
 
 B
 
 14
 In his June 1983 decision, the ALJ embraced the proposition that a study of the long-term competitive situation of the intercity bus industry was fully warranted; however, in contrast to the position championed by Greyhound's competitors, the ALJ believed that the study should not be part of the route-request proceeding at hand. In the ALJ's view, Greyhound enjoyed the BRRA-granted right to take advantage of the relaxed rules governing carrier expansion into new routes; the proposed study, however efficacious it might prove to be as a general matter, would unduly delay Greyhound's exercise of that right. The ALJ further opined that the study would best be performed under a Commission order of investigation, not an individual route-request proceeding, and proffered the recommendation to the ICC that just such an investigation be instituted. ALJ Decision, J.A. at 3. Having expressed this felt need for an industry-wide examination, the ALJ went on to grant Greyhound authority for all twenty-nine contested routes, based on his determination that the protestants had not demonstrated that granting Greyhound's application would be incompatible with the BRRA-defined "public interest." J.A. at 9-10. In determining the effect of Greyhound's new service, the ALJ expressly relied upon Greyhound's proposed bus schedules in the face of the competitors' protestations that those schedules were rendered unreliable by Greyhound's historically aggressive operating practices.
 
 
 15
 Both sides appealed the ALJ's determination to the ICC. The protestants claimed that they were improperly denied discovery and that the ALJ should either have refused Greyhound's route requests or awaited completion of the proposed study before handing down his decision. Greyhound, in contrast, claimed that the proposed industry-wide study was unnecessary but that in all other respects the ALJ's decision was unimpeachable. A division of the ICC[7] upheld the ALJ on the discovery issue, but reopened the proceedings to permit the protestants to file rebuttal statements. Greyhound Lines, Inc., Extension--One Hundred Fourteen Routes, No. MC-1515 (Sept. 23, 1983), J.A. at 2303. In the reopened proceedings, Trailways and Carolina argued once more that Greyhound's claims with respect to its proposed schedules should not be accepted, and that the ICC should instead use what the protestants claimed was Greyhound's historic practice when it enters a new route of outscheduling its competition by a margin of two-to-one.
 
 
 16
 In a February 1984 decision, the full Commission held that the protestants had not sustained their burden of proof and upheld the ALJ's grant of the new route applications. The Commission decided that, based on Greyhound's proposed schedules, insufficient evidence had been adduced to show that granting the requested routes would cause substantial impairment of the protestants' business or harm to bus service to small communities. But the ICC at this juncture parted company with the ALJ; the Commission determined that the in-depth study of the bus industry which had intrigued the ALJ was unnecessary for the simple reason that Congress had already amply considered those issues during the course of crafting and enacting the BRRA. Greyhound Lines, Inc., Extension--One Hundred Fourteen Routes, No. MC-1515 (Feb. 6, 1984), J.A. at 24, 33-34 [hereinafter cited as ICC Decision]. Trailways and Carolina now petition for review of that decision.[8]
 
 III
 
 17
 Petitioners' first complaint is directed at the ICC's interpretation of the "value of competition," 49 U.S.C. Sec. 10922(c)(3)(B), the second of the four statutorily prescribed factors which the ICC must take into account in evaluating an application. In its decision, the ICC interpreted that factor as strongly favoring approval of an application for entry. See ICC Decision, J.A. at 29; ICC Brief at 27. Petitioners argue that the ICC, when considering the value of competition, must look not only at the benefits which competition will bring, but also at the possibility that by allowing a dominant carrier into the smaller competitor's henhouse, the likely long-term result will be the destruction of nationwide competition in the intercity bus industry.
 
 
 18
 We begin with the elementary principle that in reviewing a statutory interpretation by an agency charged with administering the statute, courts are obliged first to determine whether Congress "has directly spoken to the precise question at issue"; if Congress' intent is clear, the court "must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (footnote omitted). If on the other hand Congress' intent is unclear, the court "must conduct the 'narrower inquiry into whether the [agency's] construction was "sufficiently reasonable" to be accepted by a reviewing court.' " General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1567 (D.C.Cir.1984) (en banc) (quoting FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981)) (footnote omitted); see Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., --- U.S. ----, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985).
 
 
 19
 We are persuaded that the ICC's view of the value-of-competition factor faithfully reflects Congress' intent. The National Legislature believed that increased competition would result in a more efficient bus system that would better serve the American people. See S. REP. NO. 411, 97th Cong., 2d Sess. 15 (1982), U.S.Code Cong. & Admin.News pp. 2308, 2322. ("[I]f regulatory barriers to entry into the intercity bus industry are eliminated, the threat of entry would provide incumbent carriers with the incentive to provide efficient operations at the lowest rates consistent with the quality of service that consumers prefer."). At the same time, Congress recognized the possibility that the free rein of competitive forces in this particular industry could enervate smaller carriers with the consequence that a monopoly or virtual monopoly would result. This perception of possible detrimental effects flowing from unleashed competition led Congress to require the ICC to consider as a separate factor whether new entry would result in systemwide impairment of a competitor's service. 49 U.S.C. Sec. 10922(c)(3)(D). Systemwide impairment provides a regulatory check against what Congress considered could prove to be, in some circumstances, the undesirable effects of competition. It is unlikely in the extreme, and there is no evidence whatever to suggest, that Congress intended the ICC to consider the possible negative effects of competition under the impairment factor, only then to have the Commission consider those effects all over again under the value-of-competition factor. We find no evidence in the statute or the legislative history to support petitioners' latter-day theories of double counting.[9]
 
 
 20
 In connection with their value-of-competition argument, petitioners maintain, as they did unsuccessfully before the Commission, that under Trailways v. ICC, 673 F.2d 514 (D.C.Cir.1982), "a thorough study of competitive issues in the intercity bus industry is necessary before the ICC can reach any reasoned decision with respect to additional Greyhound route requests." Reply Brief at 11 (emphasis in original). To be sure, this court strongly suggested that the ICC conduct such a study before it could appropriately award Greyhound any new route authority. 673 F.2d at 522. That case, however, was decided before Congress' passage of the BRRA, when entry was considerably more difficult. Under the pre-BRRA regime, a carrier could not be granted a new route unless the ICC determined that the service which would thereby be provided was required by the public convenience and necessity. Id. at 518. Congress, when it passed the BRRA and greatly eased entry, was plainly aware of Greyhound's dominant position and the competitive problems which that carrier potentially posed for its smaller competitors.[10] It is most unlikely that in restructuring the entire federal regulatory scheme for the bus industry, Congress would intend that the ICC conduct an in-depth, time-consuming study before Greyhound would be allowed any entry, and yet fail somehow to state anywhere in the BRRA that such a study be undertaken. Not surprisingly, there is not a shred of evidence to suggest that Congress had any such exercise in mind. Rather, it would appear that Congress intended the systemwide-impairment factor to be employed to treat the problem of Greyhound's market dominance, a legislative policy choice which implicitly supersedes the pre-BRRA requirements articulated in Trailways.
 
 
 21
 The second difficulty with petitioners' call for a court-mandated ICC study is that the purpose to be served by such a study is not at all evident. If we hypothesize, favorably to Greyhound's competitors, that the conclusion of any such study would be that Greyhound so dominates the bus industry that each new entry by that carrier constitutes another step toward monopoly power, petitioners would then presumably argue that Greyhound should not be allowed any new entry until market conditions have been ameliorated from the current situation, as they perceive it, of a very large fish in a relatively small pond of competitors. But this result or a similar conclusion could not, it seems to us, be reconciled with the terms and intent of the BRRA. For better or worse, Congress plainly intended that entry be eased for all carriers. It would fly in the teeth of Congress' intent for the ICC, through a post-BRRA study, to bar new route authority to a carrier for an indefinite period.[11] If on the other hand the study concluded that Greyhound's expansion entailed no substantial competitive problems, then the study would have been an academic exercise, with no practical effect on the BRRA's application.
 
 
 22
 Our interpretation of the value-of-competition factor finds modest support in the legislative history of the BRRA.[12] In discussing the impairment factor, the Senate Report observed that this factor
 
 
 23
 [i]s not intended to undercut or undermine the basic policy objectives ... to ease entry into the intercity bus industry. In fact, it should be noted that this impairment standard is only one of four factors to be considered by the ICC in making its public interest determination. The other factors, including the value of competition, are to be given equal consideration by the ICC.
 
 
 24
 S.REP. NO. 411, 97th Cong., 2d Sess. 17-18 (emphasis added), U.S.Code Cong. & Admin.News, pp. 2308, 2324, 2324. The implication of this brief passage is clear: the value-of-competition factor, on the one hand, and the impairment factor, on the other, pull in opposite directions. Since the systemwide-impairment factor, when it is established by a protestant, weighs against the ICC's permitting entry, the value-of-competition factor must, in our view, argue contrariwise in favor of permitting the new route authority.[13]IV
 
 
 25
 In its decision, the Commission determined that Greyhound's applications would not impair petitioners' ability to provide a substantial portion of their regular-route passenger service. The Commission concluded that Greyhound's proposed schedules were limited, and thus would not divert enough passengers from the protestants' routes to work a substantial impairment of their respective systems. Petitioners claim that the ICC committed two fatal errors in reaching this finding. First, they contend that the ICC should have allowed discovery into Greyhound's scheduling practices in general and into its overall route restructuring program.[14] Second, they maintain that in the absence of such information the ICC should not have accepted Greyhound's unsupported assertions as to its proposed schedules, but instead should have assumed that Greyhound would outschedule its competition by a two-to-one ratio, as they claim Greyhound had done when it was granted new routes in the bygone, pre-BRRA days.
 
 
 26
 With regard to the latter claim, the ICC did not, as petitioners would have it, blindly accept Greyhound's representations. Rather, the ALJ and the ICC determined that, given the routes in question and the financial incentives involved, the most logical conclusion to be drawn was that Greyhound would engage only in limited scheduling on these new routes. As we have already seen, the ALJ observed that "[a]ll of the routes sought by Greyhound are designed to mesh with existing operations of the carrier." ALJ Decision, J.A. at 4. This led the ALJ to conclude:
 
 
 27
 Abstractly speaking, [Greyhound] does have the ability to overschedule any of the sought routes, but [it] is restrained by practical considerations. It simply makes no economic sense for Greyhound to eliminate successful existing schedules. Of course, many marginal schedules will be shifted to the sought routes and will capture traffic from the protestants. However, in order for Greyhound to "over-schedule" the new routes, it must be assumed that the carrier would foresake [sic] a large share of its existing profitable patronage in order to engage protestants in a war of attrition. I find no basis herein for reaching a conclusion of that kind ... as to any of the disputed routes.
 
 
 28
 J.A. at 8. In its opinion, the ICC adopted the ALJ's conclusions in this respect. ICC Decision, J.A. at 29. In thereafter denying petitioners' request for a stay, the ICC expressly observed once more that "the ALJ concluded that although overscheduling was possible in theory, Greyhound was unlikely to do so because it would mean forsaking some existing successful operations along other routes to engage protestants in a war of attrition." ICC Stay Decision, J.A. at 43.
 
 
 29
 Thus, the ALJ and the ICC did not take Greyhound's word on faith. To the contrary, the Commission took cognizance of prevailing market conditions and determined that economically the most likely course of conduct was that Greyhound would indeed engage in the limited scheduling it had proposed, rather than the sort of profligate, cut-throat scheduling which protestants claimed would result. This conclusion is neither arbitrary nor capricious. Quite to the contrary, the ICC's conclusion in this respect seems quite logical in light of the changes to the industry wrought by the BRRA. Perhaps it made economic sense in the past for Greyhound to overschedule a route by running twice as many buses as its competitors since, after driving a competitor off the route, it was presumably difficult for new competitors to enter by virtue of the then-extant, highly restrictive entry provisions. But under the BRRA, even if Greyhound managed to drive a competitor off a route by overscheduling, at the point Greyhound sought to enjoy the fruits of its victory and reduce its schedule to a profitable level, another carrier could promptly enter the route and begin competing. For Greyhound to drive out the competition and keep the competitive field all to itself would seemingly require Greyhound to keep its routes overscheduled, and thus, unprofitable. In the real world, a world understood better by an expert agency charged with administering the federal regulatory apparatus than the generalist judiciary, the ICC could reasonably conclude that the spectre of a wolfish Greyhound driving everyone else off the road was singularly unlikely.[15]
 
 
 30
 We also cannot disagree with the Commission's decision not to allow the broad-based discovery which petitioners had requested.[16] First, the conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision.[17] Second, petitioners already had access to the documents that specifically related to the routes in question; their discovery desires went far beyond the route authority in question, however, and wandered intrusively into Greyhound's systemwide operations. Third, discovery into Greyhound's historic practices could reasonably have been determined by the agency as being of little utility, inasmuch as the present route applications represented the first time that Greyhound had beseeched the ICC for new authority in a significantly deregulated environment. Furthermore, since Greyhound's proposed scheduling plans logically meshed with its financial incentives, the ICC could reasonably have determined that the broad-based information petitioners wanted would not, at the end of the day, have convinced the ICC to reject Greyhound's proposed schedules. In an age of discovery run riot, the Commission was simply not required to allow a dragnet, expensive exercise of discovery into Greyhound's business when that discovery was seen by the agency as most unlikely to affect its decision.[18]
 
 
 31
 Our conclusion that the ICC's use of Greyhound's proposed scheduling was reasonable leads us similarly to conclude that the Commission's findings as to the business impairment of Trailways, Carolina and Peter Pan are reasonable as well. In their submissions, these three protestants all assumed that history would repeat itself, with Greyhound heavily scheduling the protested routes; armed with this premise, the protestants claimed that these aggressive scheduling practices would result in the diversion of fifty percent of their customers to Greyhound. J.A. at 671, 756-57, 894-95. The ICC could reasonably determine, however, that it was highly unlikely that the limited number of buses that Greyhound planned to run could divert enough passengers to impair substantially the ability of these three protestants to run their regular routes. Indeed, when Trailways and Carolina responded to Greyhound's proposed scheduling, they did not attempt to prove that such scheduling would cause substantial impairment; they argued, more modestly, merely that Greyhound's representations were unreliable. J.A. at 2527-31, 2637-40.
 
 
 32
 In contrast to Trailways and Carolina, Peter Pan advanced a far more focused claim of impairment, namely that a diversion of only fifteen percent of traffic from its Boston-Springfield operation could cause Peter Pan to cut back severely on all its regular route operations. J.A. at 2656. This contention suggested that a relatively modest loss in passenger traffic could have dire consequences for this small carrier striving, in the face of a powerful Captain Hook of the highways, to maintain its humble market share. But whatever its merit in the abstract, Peter Pan's contention foundered on the shoals of evidentiary failure. Peter Pan presented no evidence taht the three buses per day that Greyhound proposed (two from Springfield to Boston, one from Boston to Springfield, J.A. at 1278, 1488) would divert fifteen percent of the traffic from the twenty-five buses Peter Pan operates each day. J.A. at 1278. Peter Pan argued only that it would be "difficult to imagine that Greyhound would not be able to divert this amount of traffic" even at the frequency of three buses per day. J.A. at 2656. Suppositions and speculation will not do; a lively imagination filled with economic hobgoblins is simply insufficient to meet the BRRA's requirement that evidence be adduced to show impairment.[19] 49 U.S.C. Sec. 10922(c)(1)(A).
 
 
 33
 Peter Pan was not the only protestant which failed to meet its burden of proof. Seashore, Capital and Colonial also failed to adduce evidence upon which the Commission could reasonably have found substantial impairment. Indeed, in their joint protest, Capital and Colonial with admirable candor stated that they could not predict how much diversion Greyhound's new authority would cause or whether there would be substantial impairment of their regular route service. J.A. at 942-43. And Seashore claimed only that the "diversion of just a few passengers could easily tip the scales, and threaten Seashore's ability to provide a substantial portion of the regular route service which it currently conducts." J.A. at 1010. Specific evidence, not vague, apocalyptic visions of an economic Doomsday, was necessary in order for Seashore to prevail on this point; that evidence was not forthcoming.[20]
 
 V
 
 34
 As we have seen, one of the four enumerated factors that the ICC is to take into account in permitting entry is whether the grant of authority would have an adverse effect on service to small communities. It is in the Commission's treatment of this factor that petitioners discern yet another fatal defect in permitting the industry's dominant carrier to garner additional routes. Trailways and Carolina argued before the ICC that while their respective services to major cities and small towns were currently profitable, if Greyhound could freely enter and serve only high-volume traffic points, then overall service on these lines would become unprofitable for the two smaller carriers. In contrast to Trailways and Carolina, the other protestants claimed outright that their service to small communities operated in the red, but that they continued their operations to these communities out of a commendable, Jeffersonian sense of duty to small-town America. This pro bono publico tack of faithfully serving unprofitable routes was made possible, it was argued, by the higher volume, profitable routes' cross-subsidizing of the small-town routes. These protestants maintained that Greyhound's entry would drain revenues from their profitable routes, with the unfortunate upshot that they would no longer be able to continue the unprofitable service to the Nation's small towns. In response to these arguments, the Commission concluded that the protestants had not demonstrated as a factual matter that any small communities would, in fact, lose service if Greyhound were granted the routes in question. The ICC also emphasized that the BRRA looked strongly with disfavor on cross-subsidies, so that the protestants' cross-subsidization arguments were built on a legal foundation of sand.
 
 
 35
 We uphold the ICC's determination in this respect, principally because the protestants once again failed to sustain their burden of proof. Only Carolina and Peter Pan were able to point to any small communities that, in the protestants' view, would lose service if Greyhound's routes were granted, and we will turn to their positions in a moment. As for the other protestants, those carriers uniformly came forward with only generalized claims that service to some unidentified small towns might have to be curtailed in the wake of Greyhound's entry. The Commission could reasonably conclude that more detailed evidence would have to be forthcoming, not speculation and surmise, before any adverse effect on service to smaller communities would be shown.
 
 
 36
 The carriers (Carolina and Peter Pan) which surmounted this threshold evidentiary failure did indeed come forward with specific claims of loss of service,[21] but the two carriers' positions must ultimately fail for they grounded their claims on the defective premise which we have seen recurring in these proceedings, namely that Greyhound would heavily schedule the routes in question, which would thereby (1) cause heavy diversion of traffic to Greyhound; (2) render Carolina's and Peter Pan's operations unprofitable; and (3) force the latter two carriers to curtail their service to small towns. But as we have already seen, the Commission reasonably concluded that Greyhound was unlikely to schedule heavily the protested routes. With a more modest scheduling of only a few buses per day, the ICC determined that the diversion of traffic from Carolina or Peter Pan which would occur would not be sufficient to force them to abandon their presently served small towns.
 
 
 37
 In addition to the perceived lack of proof showing a curtailment of small-community service, the ICC relied upon what it deemed to be the BRRA's disaffinity for cross-subsidies so as to perpetuate unprofitable service on backwater routes. In this respect, petitioners object to the ICC's statement that "an inelutable tenet of the Bus Act is that all cross-subsidies are to be reduced or avoided and should not be used as a defense by protestants for continued entry protection." J.A. at 30. Such an ironclad opposition to cross-subsidies, protestants argue, is nowhere to be found in the BRRA. We need not resolve this question, since regardless of the BRRA's application in this respect the petitioners' claims fall short of establishing actual loss of service to small communities. By virtue of that failure of proof, we need not plumb the theoretical and practical depths of the BRRA's relationship to cross-subsidies.
 
 
 38
 At the same time, the Commission erred, in our view, when it treated Trailways' and Carolina's arguments as involving cross-subsidies. An examination of the protests of those two carriers demonstrates that they did not argue they were sustaining losses in their own service to small communities; instead, they argued that the grant of Greyhound's applications would result in operating losses in their small-town services, with the carriers, in consequence, having to discontinue such service. This argument is in no way precluded by the BRRA; indeed, if the small-communities factor is to have any meaning, it is precisely this type of argument which the ICC should entertain. However, the Commission's failure to give credence to the arguments of Trailways and Carolina was harmless in this case because of the recurring shortcoming in these proceedings, namely the protestants' failure to come forward with evidence to support their small-communities argument. See supra pages 24-25.[22]
 
 
 39
 For the foregoing reasons, the petitions for review are
 
 
 40
 Denied.
 
 
 
 [1]
 Section 10922 sets out the standards by which the ICC awards certificates of transportation to motor and water common carriers
 
 
 [2]
 The remainder of section 10922(c)(3)(D) states that the diversion of revenue or traffic from a carrier is not sufficient, in and of itself, to show impairment of the carrier's ability to maintain a substantial portion of its regular-route service
 The transportation policy of section 10101(a), referred to in section 10922(c)(3)(A), does not yield itself easily to a brief summary, as that provision lists numerous goals that Congress wished to achieve. Suffice it to say that section 10101(a) sets out the objective of creating, through regulation of various modes of transportation, a transportation system that benefits all those who depend upon the transportation industry--shippers, receivers, passengers, consumers and industry employees.
 
 
 [3]
 It would appear from the record that intervenor Peter Pan Bus Lines is not an NTBS member
 
 
 [4]
 It appears from the record that only Trailways and Carolina made discovery requests. However, for the sake of convenience, petitioners Trailways and Carolina, and intervenors Seashore, Capital, Colonial, and Peter Pan, will be referred to collectively as "petitioners," and the actions and arguments of any one carrier will be attributed to them all, unless the carriers are referred to specifically
 
 
 [5]
 Petitioners requested documents "regarding Greyhound's proposed schedules for and projected profits from the new routes, its policies and practices regarding terminals, interlining and related matters regarding its conduct with other carriers, and its current plans with respect to elimination and expansion of service." Petitioners' Brief at 9 n. 12
 
 
 [6]
 The ALJ denied the protestants' request for an oral hearing. J.A. at 2302
 
 
 [7]
 The Commission "may delegate to a division ... a matter before the Commission for action...." 49 U.S.C. Sec. 10305(a) (1982)
 
 
 [8]
 Peter Pan, Trailways, and Carolina petitioned the ICC for a stay pending judicial review, but the request was denied. Greyhound Lines, Inc., Extension--One Hundred Fourteen Routes, No. MC-1515 (Feb. 28, 1984), J.A. at 41 [hereinafter cited as ICC Stay Decision]. Thus, Greyhound has had authority to operate the routes in question for more than one year
 
 
 [9]
 Petitioners also argue that the systemwide-impairment factor covers only the immediate effects of entry into a specific market, whereas the value-of-competition factor encompasses the possible long-range effects that one entry can have when combined with other, future entries. However, we still find it highly unlikely that Congress would specifically require the ICC to consider some of the negative effects of competition under the impairment standard, and then require the ICC and the courts to deduce other negative effects under the value-of-competition factor. Also, nothing in the systemwide-impairment factor limits it to short-range concerns. If the evidence shows that a grant of authority would not lead to substantial impairment in the short run, but would in the long run, then substantial impairment will have been demonstrated. But it does seem true that the question is whether granting a particular route will lead to substantial impairment, not whether granting that route will lead to substantial impairment when combined with route authority that might be granted in the future
 
 
 [10]
 The Senate Report, for example, stated that "Greyhound Lines, Inc. is the largest carrier in the industry," and that "[s]tatistics reveal the predominance of Greyhound Lines, Inc., and its subsidiaries in the overall intercity bus market." S.REP. NO. 411, 97th Cong., 2d Sess. 4-5 (1982), U.S.Code Cong. & Admin.News, pp. 2308, 2311, 2312
 
 
 [11]
 During the Congressional hearings on the bus industry which led to the BRRA's passage, Trailways advanced the proposition that any bus reform act should limit Greyhound's authority to expand, while substantially deregulating all other carriers. See Bus Regulatory Reform: Hearings on H.R. 3662 and H.R. 3663 Before the Subcomm. on Surface Transportation of the House Comm. on Public Works and Transportation, 97th Cong., 1st Sess. 325, 330 (1981) (statement of Theodore C. Knappen, Senior Vice President, Trailways, Inc.) ("[T]his Committee may well feel the need to go beyond the small carrier protection contained in the ABA bill and place some specific restrictions on the market expansion, at least for a transition period, of the monopoly carrier [Greyhound]."); Deregulation of the Intercity Bus Industry: Hearing on H.R. 3663 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science and Transportation, 97th Cong., 2d Sess. 175-76 (1982) (statement of Theodore C. Knappen). Congress, of course, saw fit not to embrace this position, choosing instead to ease market entry for all carriers
 
 
 [12]
 We are acutely aware of the dangers of and limitations on reliance upon brief excerpts from a statute's legislative history. See, e.g., Eagle-Picher v. EPA, 759 F.2d 922, 929 n. 11 (D.C.Cir.1985); Community Nutrition Institute v. FDA, 757 F.2d 354, 359 (D.C.Cir.1985). We thus place little reliance on this snippet from the legislative archives
 
 
 [13]
 We note that in any event we could not order the ICC to conduct the study the petitioners so fervently desire. At most, we could determine, as we did in Trailways, that the Commission, in order to engage in reasoned decisionmaking, had to consider the long-range effects on the industry of granting Greyhound additional authority. The precise manner in which the ICC gathered the information necessary to address those effects would, of course, have been up to the Commission; it is not the province of the judiciary to dictate the procedures by which an agency gathers information. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978)
 
 
 [14]
 Since passage of the BRRA, Greyhound has been restructuring its entire system, dropping more unprofitable routes, and moving into areas where it previously had not been allowed to operate
 
 
 [15]
 Petitioners argue that Lamoille Valley R.R. Co. v. ICC, 711 F.2d 295 (D.C.Cir.1983), stands for the proposition that the Commission should not rely upon the naked assertions of applicants. While we did state there that "self-serving statements by a merging railroad's officers are entitled to little credence," the court also stated that the company's "actual financial incentives, not its professed intent, must be the dominant concern." Id. at 318. In this case, Greyhound's financial incentives were most compatible with the limited scheduling it had proposed, and the ICC took those incentives into account in reaching its decision
 The petitioners also cite Argo-Collier Truck Lines Corp. v. United States, 611 F.2d 149 (6th Cir.1979). But in that case a shipper asking for authority claimed it had no intent to divert traffic from other competitors, while the available evidence showed that regardless of intent, traffic would in fact be diverted. Id. at 154. In this case, Greyhound's intent and the objective evidence both argued for the same conclusion.
 
 
 [16]
 We note that discovery was uncommon in motor carrier application proceedings before passage of the BRRA. See ALJ Decision, J.A. at 2. It would seem that under the less-regulated environment of the BRRA, the often inefficient and time-consuming process of discovery would be even less common
 
 
 [17]
 Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978) ("the formulation of procedures was basically to be left within the discretion of agencies to which Congress had confided the responsibility for substantive judgments"); Laird v. ICC, 691 F.2d 147, 154 (3d Cir.1982). The ICC is empowered to order discovery, see 49 U.S.C. Sec. 10321(d) (1982), and the Commission has promulgated regulations governing the use of discovery, see 49 C.F.R. Secs. 1114.21 et seq. (1984). In proceedings such as the one before us, discovery may be had only if the ICC enters a decision approving discovery. Id. Sec. 1114.21(b)(1). Petitioners are not claiming that the ICC's refusal to allow discovery violates the BRRA or any other statute under which the Commission enjoys its authority, but only that the refusal was unreasonable in this case, and that in light of the refusal, the ICC could not properly rely upon Greyhound's proposed schedules
 
 
 [18]
 A case that the petitioners maintain supports their claims for discovery, Water Transport Ass'n v. ICC, 722 F.2d 1025 (2d Cir.1983), is inapplicable to the situation at hand. Water Transport held that the ICC had to allow broader discovery of certain rail transportation contracts. However, the Second Circuit was there interpreting section 208(b) of the Staggers Act, 49 U.S.C. Sec. 10713(b) (1982), which specifically required the disclosure of the essential terms of such contracts. 722 F.2d at 1032. The BRRA contains no similar provision
 
 
 [19]
 Before making the present application, Greyhound already was running two buses per day from Albany to Boston and one from Boston to Albany; indeed, Greyhound had maintained approximately the same level of service between those two points for a quarter century. J.A. at 888, 1488. However, Greyhound was prohibited under the old, heavily regulated regime from stopping at Springfield, which was directly on the route which Greyhound travelled. The BRRA allows a carrier to remove "automatically" such restrictions in an expedited proceeding authorized by 49 U.S.C. Sec. 10922(i)(4). Such a removal could be prohibited only if the elimination of such restrictions would have a harmful impact on commuter bus operations
 Greyhound did not apply for the removal of restrictions under the expedited proceeding provisions, however; instead, it chose to apply under the "public interest" provisions of 49 U.S.C. Sec. 10922(c). Nonetheless, the Commission stated that "[w]hen an applicant seeks to consolidate authority for existing routes or to complete authority for existing services which are subject to restrictions, it is proper to require an even greater showing from a protestant objecting to the accomplishment of such modest goals." J.A. at 32-33. Petitioners object that nothing in the BRRA allows the ICC to increase the burden of proof in "public interest" proceedings. They argue that even if Greyhound could have had its restrictions automatically lifted through the provisions for expedited proceedings, since Greyhound chose to use the "public interest" proceeding, it must proceed under the more stringent requirements of 49 U.S.C. Sec. 10922(c).
 Petitioners are quite right that nothing in section 10922(c) specifically provides that any greater showing is required by a protestant when an applicant seeks intermediate point authority. On the other hand, quite aside from the deference appropriately owed by the courts to an agency's interpretation of the statute, see supra page 10, we stated only last year in Trailways, Inc. v. ICC, 727 F.2d 1284 (D.C.Cir.1984), that the provisions of section 10922(i).
 are functionally equivalent to a judgment that it will always be in the public interest for a carrier to be permitted to make intermediate stops along a route it is already serving. Underlying this judgment is a principle that the energy conservation and efficiency gained by permitting intermediate stops on certificated routes will usually outweigh any detriments--such as competitive harm suffered by competing carriers--that new service to intermediate points could cause.
 727 F.2d at 1290. These considerations lead to the conclusion that at least the first factor of section 10922(c)--the transportation policy of 49 U.S.C. Sec. 10101(a)--argues strongly for granting intermediate point authority. Thus, at least in that respect, a protestant would seemingly have to make a stronger showing to prove its case, because one factor would be weighing heavily in favor of granting the application. But since the ICC's reasoning in this respect is not crystal clear, we pursue this issue no further and do not rest our holding upon the propriety of demanding a stepped-up showing. Rather, we quite narrowly conclude that, even assuming arguendo that the ICC erred as a matter of law, the agency's error does not alter our substantive conclusion by virtue of the protestants' failure to adduce sufficient evidence to prove that Greyhound's applications were not in the public interest.
 
 
 [20]
 Petitioners claim in this regard that the ICC construed the "substantial impairment" test too strictly, by requiring protestants to prove that their businesses would be destroyed by the granting of the applications before impairment could be found. We quite agree with petitioners that a carrier could sustain impairment of its entire regular-route system, within the cognizance of the BRRA, without experiencing outright destruction of its business. However, we are unable to agree with petitioners' fervent claim that the ICC in fact applied a "business destruction" test in gauging impairment vel non. To be sure, the Commission did state that it had to "consider whether [Greyhound's] competition is likely to have an impact so great as to be destructive of the only nationwide competition it has within the intercity bus industry." ICC Decision, J.A. at 31. But the ICC went on to state that "[e]ven if the protestants' gloomy predictions of diversion prove correct, we find no adequate basis for their contention that their businesses will be destroyed." J.A. at 31-32 (emphasis added). Fairly viewed, the ICC was not imposing a test that required a showing of business destruction, but was, instead, responding to the protestants' claims of business destruction. The Commission evidenced its appreciation of the correct standard when it stated that "[t]he standard we must consider is whether these [competitive] impacts are so severe as to materially jeopardize the ability of the protesting carriers to provide a substantial portion of their entire systems of regular-route passenger service." J.A. at 31
 
 
 [21]
 Carolina listed 20 communities in Virginia and North Carolina that it claimed would suffer an immediate loss of service, see J.A. at 721. Carolina also listed other communities where it was doubtful, in Carolina's opinion, that service could be maintained in the long run. See J.A. at 722-23
 In its original protest, Peter Pan claimed that a 15% diversion of its traffic would drive it out of the regular-route business. See J.A. at 895. Thus, the carrier claimed that all the small communities it currently serves (30 in all) would lose service. See J.A. at 895, 917. Peter Pan did not alter this position in its rebuttal to Greyhound. J.A. at 2656.
 
 
 [22]
 The ALJ likewise appeared to have fallen into error when, in discussing the small-communities factor, he stated that not only was there no showing that any small community would lose service from the granting of Greyhound's application, but that it was also possible that "new carriers ... may emerge to meet passenger needs abandoned by applicant and protestants." ALJ Decision, J.A. at 9. As we stated in a slightly different situation in Pennsylvania Pub. Util. Comm'n v. United States, 749 F.2d 841 (D.C.Cir.1984), the ICC cannot make its public-interest finding by relying on a "speculative 'belief' that a low cost carrier might someday provide alternative bus service to the affected communities." Id. at 854. The ALJ had to have some evidence that there were in fact carriers likely to institute service to the affected communities before he could invoke such a possibility to justify granting the applications. Otherwise, the small-communities factor becomes meaningless, for the ICC could always idly speculate that if a protestant abandons a community, another carrier might come in and save the day. However, due to the protestants' lack of proof in this case, the ALJ's error is, when all is said and done, harmless